USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/11/14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

**ANDREW WILLIAMS,**

          **Plaintiff,**

      - against -

**JEAN G. KING, Deputy Superintendent of Program**
**(DSP), IMAM ABDUL LATIF, Facility Muslim**
**Chaplain, LT. W. MEAD, C.O. R. HUGGLER, and**
**LT. S. KATZ,**

          **Defendants.**

------------------------------------------------------------ X

**OPINION AND**
**ORDER**

**11-cv-1863 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Andrew Williams, an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), brings this

action pursuant to section 1983 of Title 42 of the United States Code ("section

1983"). Williams alleges that Jean G. King, Imam Abdul Latif, Lt. W. Mead,

Correction Officer R. Huggler, and Lt. S. Katz (the "Defendants") (1) violated his

rights to the free exercise of religion under the First Amendment, the Equal

Protection clause, and the Religious Land Use and Institutionalized Persons Act of

2000 ("RLUIPA"); (2) denied him his due process rights in connection with a

1

prison disciplinary hearing; and (3) violated his right to be free from discrimination and retaliation for exercising his right to file grievances. On March 19, 2014, the parties stipulated to a dismissal with prejudice of the Due Process claim against Mead, the 2009 Free Exercise claim against Katz, and the RLUIPA claim against all Defendants.[1] Williams seeks injunctive and/or declaratory relief ordering the Defendants to expunge the disciplinary charges pending against him and seeks to recover compensation for the denial of his constitutional rights.[2] Defendants now move for summary judgment on several grounds including failure to state a claim, failure to exhaust administrative remedies, lack of personal involvement, statute of limitations, and qualified immunity.[3] For the following reasons, the Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## II.   BACKGROUND

### A.   First Amendment and Equal Protection Claims

Williams, a Shiite Muslim, has been incarcerated at Woodbourne Correctional Facility ("Woodbourne") since July 2007 after being transferred from

---

[1]     The following are the remaining claims:  (1) the First Amendment and the Equal Protection claims against King and Latif stemming from actions in 2008, 2009, and 2010; and (2) the retaliation claims against King, Katz, and Huggler.

[2]     *See* Second Amended Complaint ("SAC"), at 20.

[3]     *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment Dismissing the Complaint ("Def. Mem."), at 2.

Sing Sing Correctional Facility.[4]  Since his arrival at Woodbourne, Williams has

conducted Shiite religious classes and prayer sessions on Thursday evenings,

attended religion classes on Saturdays and Sundays, and officiated at the Islamic

holidays of Ghadir and Mubahila.[5]

On December 10, 2007, Jean King, Superintendent of Programs,

received an email from Howard Dean, the DOCCS Director of Nutritional

Services, containing the menus for the upcoming Islamic holidays (Ghadir,

Mubahila, and the ten days of Muharram).[6]  Dean asked King to provide a copy of

the email to the coordinating chaplain, Imam Abdul Latif.[7]  When King informed

Latif of the number of inmates who would participate, Latif told King "that the

congregation would only celebrate the last two days" of the ten days of Muharram

– according to Sunni custom.  King asked Latif "to relay this information to the

---

[4]     *See* 3/14/14 Declaration of Andrew Williams in opposition to
Defendants' Motion for Summary Judgment ("Williams Decl.") ¶ 7.

[5]     *See id.* ¶ 16.

[6]     Ghadir and Mubahila are celebrated by all Shiiite Muslims, but only
certain Sunni Muslims.  With respect to Muharram, Shiites pray and fast for the
full ten day duration while Sunnis either fast on the last day, known as Ashura, or
the last two days.  *See* Plaintiff's Statement of Additional Facts Pursuant to Local
Rule 56.1 ("Pl. 56.1") ¶¶ 4-5.

[7]     Latif, a Sunni Muslim, was the Muslim chaplain at Woodbourne from
2007 to late summer 2010.  *See* Williams Decl. ¶ 21.

Food Service Administrator so that [King] would not be accused of denying inmates their rights."[8]  On December 19, 2007, King received a forwarded email from Mark Leonard, former DOCCS Director of Ministerial, Family and Volunteer Services, advising the Woodbourne staff that the "Islamic Holy days of Muharram and Mubahilah" were not restricted to Shiites; rather "[a]nyone of the Islamic faith" could participate.[9]  Several days before Muharram, Shiite inmates spoke to Latif about fasting for the ten days of Muharram, from January 10 to 19, 2008, but were advised that it was too late to order Halal food.[10]  Although the religious calendar issued by DOCCS recognized that fasting lasted for the full ten days of Muharram, Woodbourne only provided special meals for the last two days.[11]

On January 14, 2008, in the middle of Muharram, Williams and other Shiite inmates filed a grievance with the Inmate Grievance Resolution Committee

---

[8]     Pl. 56.1 ¶ 18. *See also* 3/17/14 Declaration of Rebecca Rettig, plaintiff's counsel, in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Rettig Decl."); 1/17/08 Memorandum from King to Tim TerBush, Supervisor/Inmate Grievance re: "Response to WB 14125-08," Bates 68, ("1/17/08 Memorandum"), Ex. 6 to Rettig Decl.

[9]     12/19/07 Email from Leonard to King, Bates 69, Ex. 6 to Rettig Decl.

[10]     *See* Pl. 56.1 ¶ 21; 1/17/08 Memorandum, Bates 68, Ex. 6 to Rettig Decl.

[11]     *See* Williams Decl. ¶¶ 17-18.

4

("IGRC").[12]  They asked to be provided with "the morning and evening meals

outlined in menus issued by the Office of Nutritional Services, Ministerial

Services, religious calendar of 2008 and Directive 4202" for the full ten days of

Muharram in order to complete their fast.[13]  In response to the grievance, King

stated that the "[a]dministration will assure that religious meals are provided in the

future.  However, there is no way to supply retroactive meals."[14]  On January 23,

2008, the IGRC found that Latif's decision to limit the fast to the last two days was

a violation of the Protocol and found that his behavior was "so egregious and

factious" that the Committee recommended "formal disciplining and/or

reprimand."[15]  On February 12, 2008, the Superintendent issued a decision on the

---

[12]     *See* Pl. 56.1 ¶ 25.

[13]     *Id.  See also* Case History & Record, WB-14125-08, Bates 3-4, Ex. 13
to Rettig Decl.; 1/11/08 Williams Grievance re: "Fasting Ten Days of Muharram,"
Bates 23, Ex. 13 to Rettig Decl.  In 2001, DOCCS promulgated the Protocol for
Shiite Muslim Programs and Practices in order to "'fine tune' the religious
programming by which Shiite Muslim inmates' religious practices and beliefs are
to be more adequately accommodated in accordance with the requirements and
provisions of the Department's Directive #4202 (Religious Programs and
Practices)." 10/26/01 Protocol for Shiite Muslim Programs and Practice
("Protocol"), Bates 26-28, Ex. 13 to Rettig Decl.

[14]     1/17/08 Memorandum, Bates 68, Ex. 6 to Rettig Decl.  *See also* Pl.
56.1 ¶ 26.

[15]     Case History & Record, Re: WB 14125-08, Bates 3-4, Ex. 13 to
Rettig Decl.

grievance noting that "the facility followed the decision of the facility Imam [Latif] to celebrate only the final two days," and stated that "[t]he facility is on board for future events that involve specific menus for all Muslim factions."[16]

Shiite Muslims celebrated Ghadir on December 16, 2008, and Mubahila on December 23, 2008, and Williams officiated at services for both holidays.[17]  On December 26, 2008, following the Friday sermon, Latif stated to the Muslim congregation that fasting during the ten days of Muharram was not of any religious importance in the Islamic faith.[18]  As a result, during the ten days of Muharram from December 28, 2008 to January 7, 2009, Woodbourne did not provide any special meals or hold services.[19]  On January 14, 2009, Williams filed a grievance regarding Latif's December 26, 2008 remarks and requested that Latif make a formal apology to the Shiite Muslims.[20]  The Superintendent concluded that

---

[16]    2/12/08 Superintendent's Response, WB-14125-08, Bates 22, Ex. 13 to Rettig Decl.  *See also* Pl. 56.1 ¶ 27.

[17]    *See* Williams Decl. ¶ 20.

[18]    *See id.* ¶ 21.

[19]    *See id.* ¶ 22.

[20]    *See* Pl. 56.1 ¶ 31; 1/14/09 Williams Grievance re: "Inappropriate Comments", Bates 58, Ex. 6 to Rettig Decl.

"[a] formal apology from the Imam is not necessary."[21]

On April 1, 2009, Williams filed a grievance stating that "Shiite Muslims are not allowed to officiate at the Friday Weekly Jumuah Services and there is no Shiite Muslim on the Majlis Deputy."[22]  On April 6, 2009, King wrote a memorandum to Tim TerBush, the grievance supervisor, stating that "[t]here are no registered Shiite Muslims at Woodbourne Correctional Facility at this time."[23] DOCCS Central Office Review Committee ("CORC") investigated Williams's grievance, including arranging an April 1, 2009 visit from Imam Abdul Mubdi, the Ministerial Program Coordinator for Shiites.[24]  In response to the investigation, King stated that "[n]othing was done during the Ten Days of Muharram.  Please be advised that last week, Imam Abdul Mubdi visited the facility and I ran a roster of

---

[21]    2/26/09 Superintendent's Response, WB 14461-09, Bates 59, Ex. 6 to Rettig Decl.  *See also* Pl. 56.1 ¶ 32.

[22]    4/1/09 Williams Grievance re: "Non-Compliance with Shiite Protocol", Bates 92, Ex. 14 to Rettig Decl.; Protocol, Bates 26-28.  *See also* Pl. 56.1 ¶ 36.  Shiite Muslim Chaplains "shall be entitled to officiate at the weekly Jum[uah] services in the same manner as any other Muslim chaplain or outside volunteer Chaplains." Protocol, Bates 28.  Additionally, where Shiite Muslim inmates are present in the general prison population, "the Muslim Chaplain shall ensure that the Muslim Majlis shall have at least one Shiite Muslim member." *Id.* Majlis is defined as a Muslim governing board. *See* Williams Decl. ¶ 24.

[23]    4/6/09 Memorandum from King to TerBush re: WB-14523-09, Bates 100, Ex. 14 to Rettig Decl.  *See also* Pl. 56.1 ¶ 37.

[24]    *See* Pl. 56.1 ¶ 33.

Shiite inmates.  No one at Woodbourne, including the grievant, is registered for this faith group."[25]

On April 8, 2009, Williams was notified of a policy at Woodbourne that required him to register as a Shiite Muslim in order to continue participating in Shiite classes and fasting during Ghadir, Mubahila, and the ten days of Muharram.[26]  Nonetheless, Williams did not register as a Shiite Muslim until December 30, 2009.[27]  From April 2009 until January 2010, Williams was not permitted to participate in Thursday evening Shiite prayer sessions.[28]  On November 20, 2009, Williams filed a grievance requesting that Shiite Muslims be

---

[25]   4/7/09 Email from King to CORC, Bates 72, Ex. 6 to Rettig Decl.  *See also* Pl. 56.1 ¶ 34.

[26]   *See* Williams Decl. ¶ 23.  King states that between 2008 and January 2010, Woodbourne did not have any inmates registered as Shiite Muslims and therefore the facility did not provide religious accommodations for Shiite Muslims. *See* 1/10/13 Declaration of Jean G. King in support of Defendants' Motion for Summary Judgment ("King Decl.") ¶¶ 10-11.

[27]   Defendants produced a "Change of Religion" form, dated December 30, 2009, which purports to be signed by Williams in which he "profess[es] to be of the Shiite Muslim faith."  12/30/09 Religion Change Form, Bates 203, Ex. 5 to Rettig Decl.  However, at his deposition Williams testified that he did not recall filling out this form and questioned if the signature was his.  *See* 1/10/14 Declaration of Michael J. Keane, defendants' counsel, in support of Defendants' Motion for Summary Judgment ("Keane Decl."); 10/11/12 Williams Deposition ("Williams Dep."), Ex. D to Keane Decl., at 25.

[28]   *See* Williams Decl. ¶ 24.

permitted a staff advisor.  Williams was informed by Reverend Santiago, Woodbourne's senior chaplain, that the religion register from Albany listed only Islam as a recognized religion, rather than Sunni or Shiite denominations. According to Williams, Santiago said he would speak to Latif about the situation because "Sunnis were not registered but were allowed their rights."[29]

In December 2009, Latif issued multiple memoranda about Shiite worship at Woodbourne, which were signed by King and included a list of individuals registered as Shiites at the facility.  Williams's name was not on the list.[30]  As a result, Williams was not permitted to celebrate Ghadir or Mubahila on December 6 and December 12, 2009 by fasting or attending services.[31]  Williams filed a grievance on December 14, 2009, complaining about his exclusion from services and fasting during the prior weeks' holidays.  In response, Latif stated that "Ghadir and Mubahila are observances unique to Shiite Muslims.  Therefore, any[] inmate wishing to attend a religious observance of his designated religion must be

---

[29]    11/20/09 Williams Grievance re: "Change of Staff Advisor", Bates 120-21, Ex. 10 to Rettig Decl.  *See also* Pl. 56.1 ¶ 39.

[30]    *See* 12/2/09 Memorandum from Latif re: "Day of Ghadir, Sunday, December 6th, 2009 & Day of Mubahila, Saturday, December 12th, 2009," and 12/14/09 Memorandum from Latif re: "Shiia Classes," and 12/14/09 Memorandum from Latif re: "Muharram Fast," Ex. 15 to Rettig Decl.  *See also* Pl. 56.1 ¶ 40.

[31]    *See* Williams Decl. ¶ 26.

documented or noted as such in facility records."[32]  During the ten days of Muharram from December 18 to 27, 2009, Williams was permitted to fast but not to attend services.[33]

On March 10, 2010, after investigating Williams's grievance of December 14, 2009, CORC issued a decision stating that Williams's request was "unanimously accepted [and that] the religious calendar includes Shiite Muslims in the Islamic faith.  Therefore, any Muslim who signs up for an Islamic holiday observation will be permitted to attend.  With regard to [Williams's] appeal, CORC notes that the Imam is now following the 2010 Religious Calendar."[34]  In December 2010, Williams was permitted to participate in Ghadir and Mubahila and to fast for the ten days of Muharram but again was not permitted to attend services for Muharram.[35]  Although Williams's name was on the list of the general Muslim community celebrating Muharram in December 2010, and although he had formally registered as a Shiite on December 30, 2009, Woodbourne's

---

[32]    12/27/09 Memorandum from Latif to TerBush re: "Response to Grievance Complaint #14730," Bates 136, Ex. 8 to Rettig Decl.  *See also* Pl. 56.1 ¶ 41.

[33]    *See* Williams Decl. ¶ 27.

[34]    3/10/10 CORC Decision, WB-14730-09, Bates 129, Ex. 8 to Rettig Decl.  *See also* Pl. 56.1 ¶ 43.

[35]    *See* Williams Decl. ¶ 28.

memorandum for the 2010 Muharram fast did not list Williams.[36]  Consequently,

Williams was not permitted to attend services for Muharram in December 2010.[37]

**B.    Retaliation Claims**

In Spring 2010, Latif warned Williams that he might receive a

misbehavior report as a result of his "continuous complaints."[38]  On March 31,

2010, Williams told King that he would be submitting paperwork for a fundraiser

to support Shiite religious practice at Woodbourne.  King informed him that his

application would be denied due to filing "numerous false grievances."[39]  On April

9, 2010, Williams filed a grievance with the IGRC seeking permission to conduct

the fundraiser.[40]  TerBush informed Williams that King would be upset about the

grievance.[41]  Subsequently, King denied Williams's request because she concluded

_____

[36]     *See* 12/7/10 Muharram 2010 Memorandum, Ex. 11 to Rettig Decl.
*See also* Pl. 56.1 ¶ 46.

[37]     *See* Pl. 56.1 ¶ 47.

[38]     Williams Decl. ¶ 32.

[39]     *Id.* ¶ 29.  King states that the fundraiser was denied because Williams
had not submitted the appropriate paperwork.  *See* King Decl. ¶ 16.

[40]     4/9/10 Williams Grievance, WB-14811-10, Bates 144, Ex. 12 to
Rettig Decl.  *See also See* Pl. 56.1 ¶ 52.

[41]     *See* Williams Decl. ¶ 31.

11

there was "no need" for a fundraiser.[42]

The day after King denied Williams's request, Corrections Officer Huggler searched Williams's cell pursuant to an order by Lt. Steven Katz.[43] The search lasted fifty-five minutes, according to Williams, which was longer than the usual ten to fifteen minutes.[44] During the search, Huggler asked Williams to leave the cell to dispose of trash. Upon Williams's return to the cell, Huggler had confiscated a blue rock, two photographs, a metal binder, and outdated medication from Williams's cell.[45] After the search, Corrections Officer Carpenter asked Williams what he had done to upset King.[46] As a result of the items confiscated from Williams's cell, Williams was issued a misbehavior report charging him with

---

[42]    Pl. 56.1 ¶ 54 (quoting 5/25/10 Superintendent's Response, WB 14811-10, Bates 145, Ex. 12 to Rettig Decl.).

[43]    *See* Pl. 56.1 ¶ 55. *See also* 6/22/10 Williams Grievance, WB 14857-10, Bates 162, Ex. 16 to Rettig Decl. *See also* Letter from Corrections Officer Huggler to Sgt. J. Bowers, Re: Grievance WB 14857-10, Bates 170, Ex. 16 to Rettig Decl. Katz states that he did not order any search of Williams's cell in retaliation for any of Williams's actions and that he was not aware of any grievances that Williams had filed against Woodbourne or its employees until after the cell search in May 2010. He further states that if he did order the search of Williams's cell it was either part of a random search or due to suspicious behavior reported by a supervisor. *See* Declaration of Steven A. Katz in support of Defendants' Motion for Summary Judgment ("Katz Decl.") ¶¶ 6-10.

[44]    *See* Pl. 56.1 ¶ 60.

[45]    *See id.* ¶¶ 57-58.

[46]    *See id.* ¶ 61.

violations of the prison rules.  He was immediately moved to C-1 Special Housing Unit ("SHU"), despite the fact that his infraction was classified as a Tier II violation and not Tier III.[47]  While DOCCS policy only requires a Superintendent's hearing for Tier III violations and above, King ordered a disciplinary hearing and appointed Lt. W. Mead to preside over the hearing.  Williams was found guilty of two of the charges and sentenced to thirty days in the SHU.[48]

Williams also claims continued instances of retaliation by Huggler, including deleting a disk containing his draft complaint for this case in January 2012, opening and detaining his legal mail in September 2012, and causing him to be tardy for a call with the Court in February 2013.[49]  Additionally, Williams filed multiple grievances alleging that Lt. Katz ordered a second retaliatory cell search that resulted in another misbehavior report and disciplinary hearing.[50]

## III.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate "where, construing all the evidence

---

[47]    *See id.* ¶¶ 63-64; 5/26/10 Misbehavior Report, Ex. 17 to Rettig Decl.

[48]    *See* Pl. 56.1 ¶¶ 65-72.  Williams has withdrawn his due process claim against Mead.

[49]    *See* Williams Decl. ¶ 41.

[50]    *See id.*

in the light most favorable to the non-movant and drawing all reasonable

inferences in that party's favor, there is 'no genuine issue as to any material fact

and . . . the movant is entitled to judgment as a matter of law.'"[51]  However, "'only

admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment.'"[52]  In deciding a motion for summary judgment, "[t]he role of

the court is not to resolve disputed issues of fact but to assess whether there are any

factual issues to be tried."[53]   "'Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge.'"[54]

**B.    Section 1983**

"To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege

(1) 'that some person has deprived him of a federal right,' and (2) 'that the person

---

[51]    *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 692
(2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)) (other quotations omitted).

[52]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d
244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir.
1997)).

[53]    *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir.
2012).

[54]    *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)
(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

who has deprived him of that right acted under color of state . . . law.'"[55] Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[56] Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation.[57] "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[58] Thus, a supervisory official cannot be held liable solely on account of the acts or omissions of her subordinates.[59] A supervisor has sufficient personal involvement when she

---

[55]     *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

[56]     *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

[57]     *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991))).

[58]     *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009) (citations omitted) (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

[59]     *See Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation.").

participates directly in the alleged constitutional violation, creates a policy or custom under which unconstitutional practices occur, or allows such practices to continue.[60]

### C.    Exhaustion Under the Prison Litigation Reform Act ("PLRA")

The PLRA requires that prisoners exhaust all administrative remedies before bringing an action regarding prison conditions.[61]  Failure to exhaust is an absolute bar to an inmate's action in federal court, as the PLRA "*requires exhaustion of available administrative remedies before inmate-plaintiffs may bring*

---

[60]    In 1995, the Second Circuit held that the following are sufficient to constitute personal involvement:  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).  However, only the first and third factors have survived the Supreme Court's decision in *Iqbal*.  *See Spear v. Hugles*, No. 08 Civ. 4026, 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009).

[61]    *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").

their federal claims to court *at all*."[62]  Further, given the plain meaning of "no

action shall be brought," the Act requires an inmate to exhaust his claims prior to

filing the initial complaint; "[s]ubsequent exhaustion after suit is filed . . . is

insufficient."[63]  The United States Supreme Court has held that "the PLRA's

exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong."[64]

        The DOCCS administrative grievance process, the Inmate Grievance

Program ("IGP"), is well established.[65]  Under the IGP, if an inmate files a

grievance and receives no response, the inmate must nevertheless exhaust his

appeals to the facility warden, the CORC, and the Board of Correction.[66]

"Complaints and communications made outside of formal grievance procedures do

---

        [62]    *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) (quotation marks and
citation omitted, emphasis in original).

        [63]    *Id.*

        [64]    *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

        [65]    The IGP is a four-step process that requires inmates to: (1) file a
complaint with the IGRC and request a formal hearing, (2) appeal to the facility
warden or his designee, (3) appeal to CORC, and (4) appeal to the New York City
Board of Correction. *See Bush v. Horn*, No. 07 Civ. 3231, 2010 WL 1712024, at
*3 (S.D.N.Y. Mar. 2, 2010).

        [66]    *See Williams v. City of New York*, No. 03 Civ. 5342, 2005 WL
2862007, at *10 (S.D.N.Y. Nov. 1, 2005).

not satisfy the PLRA's exhaustion requirement."[67]  Failure to exhaust is an

affirmative defense that may be waived if not raised by the defendants.  Moreover,

a defendant can be estopped from asserting this affirmative defense when the

defense is not timely raised or if the defendant took some action to inhibit the

inmate from exhausting his administrative remedies.[68]

## IV.    APPLICABLE LAW

### A.    Free Exercise

It is well settled that inmates are afforded constitutional protection to

practice their religion under the Free Exercise Clause of the First Amendment.[69]

This protection extends to a prisoner's "right to a diet consistent with his or her

religious scruples"[70] and "right to participate in congregate religious services."[71]  In

order to establish a free exercise claim, "'[t]he prisoner must show at the threshold

that the disputed conduct substantially burdens his sincerely held religious

---

[67]     *Jones v. Rikers Island Care Custody*, No. 07 Civ. 10414, 2010 WL
148616, at *2 (S.D.N.Y. Jan. 14, 2010).

[68]     *See Veloz v. State of New York*, 339 F. Supp. 2d 505, 515-16
(S.D.N.Y. 2004).

[69]     *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).

[70]     *Id.* at 597.

[71]     *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993).

beliefs.'"[72]

   Because the free expression rights of prisoners must be balanced against the "'interests of prison officials charged with complex duties arising from administration of the penal system,'"[73] free exercise claims of prisoners are evaluated "under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."[74]  Under the First Amendment, "a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is 'reasonably related to legitimate penological interests'"[75] – even if the policy substantially burdens an inmate's free exercise.[76]

   In making a reasonableness determination, courts must consider four factors:

---

  [72] *Holland v. Goord*, — F.3d —, 2014 WL 3360615, at *5 (2d Cir. Jul. 10, 2014) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). The court noted that although the validity of the substantial burden requirement in the Second Circuit is unclear it would still apply that test.

  [73] *Ford*, 352 F.3d at 588 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)).

  [74] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

  [75] *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (quoting *O'Lone*, 482 U.S. at 349).

  [76] *See Holland,* 2014 WL 3360615, at *6.

whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.[77]

The Second Circuit has held that requiring an inmate to register his religious affiliation serves legitimate penological interests.

Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. Registration also allows prison officials to gauge the interest in any particular religion on the part of the inmate population and thus decide whether a "congregation" should be allowed. Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be needed.[78]

## B.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that "all persons similarly situated should be treated alike."[79]  In order to make an

---

[77]     *Salahuddin*, 467 F.3d at 274 (citing *Turner*, 482 U.S. at 90-91).

[78]     *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096-97 (2d Cir. 1997) (rejecting plaintiff's claim that he did not need to identify his sect in addition to registering as a Muslim).

[79]     *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Equal Protection claim, a plaintiff must prove that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."[80]  Moreover, the discrimination must be purposeful.[81] The Supreme Court has held that not "every religious sect or group within a prison – however few in number – must have identical facilities or personnel."[82] Additionally, distinctions made between similarly situated religious groups in prison must only withstand a rational basis review and be reasonably related to legitimate penological interests.[83]

### C.   First Amendment Retaliation

"'To prevail on a First Amendment retaliation claim brought under 42 U.S.C. § 1983, a prisoner must demonstrate (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and

---

[80]   *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980).

[81]   *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995).

[82]   *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972).

[83]   *See Graham v. Mahmood*, No. 05 Civ. 10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008) (holding that even if Nation of Islam members and Sunni Muslims were similarly situated, denying the former additional access to prison facilities was reasonably related to valid penological interests).

(3) that there was a causal connection between the protected speech and the adverse action.'"[84]  "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care."[85]  "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."[86]

### D.    Statute of Limitations

"Federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions, as well the state's tolling rules."[87]  However, federal law determines when a federal claim accrues.[88]  "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the alleged[ ] injury-causing act."[89]  In the case of a "'continuous practice and policy of discrimination[,] . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in

---

[84]    *Ford v. Palmer*, 539 Fed. App'x 5, 6 (2d Cir. 2013) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

[85]    *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001).

[86]    *Id.* at 493 (citations omitted).

[87]    *Connolly v. McCall*, 254 F.3d 36, 40-41 (2d Cir. 2001).

[88]    *See Morse v. University of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992).

[89]    *Hunt v. Meharry Med. Coll.*, No. 98 Civ. 7193, 2000 WL 739551, at *3 (S.D.N.Y. Jun. 8, 2000).

furtherance of it.'"[90]

### E.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[91]  A court must consider "'both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances then confronting a defendant, would have understood that his actions were unlawful.'"[92]  Qualified immunity is not properly granted where the facts alleged show that the official's conduct violated a constitutional right and the right was clearly established.[93]  "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood

---

[90]    *Cancel v. Mazzuca*, No. 01 Civ. 3129, 2003 WL 1702011, at *4 (S.D.N.Y. Mar. 28, 2003) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)) (citations omitted).

[91]    *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[92]    *Holland*, 2014 WL 3360615, at *6 (quoting *Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir. 2003) (per curiam) (internal quotation marks omitted).

[93]    *See Erlich v. Town of Glastonbury*, 348 F.3d 48, 55 (2d Cir. 2003).

from the existing law that [his] conduct was unlawful.'"[94]

## V.   DISCUSSION

The following claims arise out of an alleged pattern and practice of religious discrimination against Shiite Muslims.  Williams alleges that beginning in January 2008, Latif, a Sunni Muslim, purposefully denied Shiite Muslims the right to pray and fast for the full ten day duration of Muharram, and allowed fasting and prayers only on the last two days in accordance with Sunni custom.[95]  Williams further claims that despite King's assurance that the necessary religious meals would be provided in the future, Shiites were again denied the right to fast and pray for all ten days of Muharram when Latif "elevated Sunni practice over Shiite practice" the following year.[96]  Williams contends that beginning on April 1, 2009, King attempted to legitimize Latif's discriminatory conduct by establishing a "policy" requiring Shiite Muslims, and no other religious sect, to register their denomination with Woodbourne.[97]  King maintains that, because the observance of the ten days of Muharram is a practice unique to Shiites, accommodations were

---

[94]     *Pugh v. Goord*, 571 F. Supp. 2d 477, 510 (S.D.N.Y. 2008) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)).

[95]     *See* Pl. Mem. at 1.

[96]     *Id.*

[97]     *See id.*

unnecessary in the absence of registered Shiites.[98]  Latif's alleged discriminatory

conduct continued through 2010 by denying Williams and other Shiites the right to

attend Shiite Muslim classes, to fast and pray during Ghadir and Mubahila, and to

attend services during the ten days of Muharram.[99]  Finally, Williams alleges that

as a result of grieving "Latif's denials of religious freedom – and King's

sanctioning of such denials," Defendants engaged in a pattern and practice of

retaliation against him.[100]

### A.   First Amendment Free Exercise Claims[101]

#### 1.   Pre-April 2009 Policy – Free Exercise Claims Against King and Latif

Defendants argue that because Woodbourne had no registered Shiites

---

[98]     *See* Reply Declaration of Jean G. King, in support of Defendants' Motion for Summary Judgment, ¶ 6.

[99]     *See* Pl. Mem. at 1.

[100]     *Id.* at 2.

[101]     Williams has alleged sufficient personal involvement by both Latif and King, through their direct participation, as well as their creation and implementation of the alleged selectively discriminatory policy. *See Colon*, 58 F.3d at 873.  Williams points to Latif's decision to only celebrate the last two days of Muharram according to Sunni custom, Latif's alleged comments that fasting during the ten days of Muharram was not of any significance to the Islamic faith, and that the Islamic holidays of Ghadir and Mubahila were unique to Shiite Muslims.  Additionally, Williams has shown that while King considered and responded to several grievances based on Latif's alleged denials of religious accommodations, she allowed the denials to continue and consciously administered the alleged selectively discriminatory policy.

25

between 2008 and 2010, they "did not provide religious accommodations specific to Shiite Muslims."[102]  They further argue that "it [therefore] served no purpose whatsoever, penological or otherwise, to plan accommodations for a population that may or may not have been present in the facility."[103]

Williams, in turn, offers evidence that Woodbourne has had a practicing Shiite community since at least 2007.  Williams conducted prayer sessions and classes at Woodbourne from July 2007 through March 2009, and Williams and other Shiite inmates were listed on Woodbourne records, signed by King and Latif, to participate in the Islamic holidays in December 2008.[104] Additionally, in January 2008, when Williams filed a grievance based on his inability to participate in the Muharram fast, King responded that the "[a]dministration will assure that religious meals are provided in the future."[105] King noted that she had appointed Latif to arrange for the Muslim community's meals during Muharram so that she "would not be accused of denying inmates

---

[102]     Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment Dismissing the Complaint ("Reply Mem."), at 3.

[103]     *Id*. at 4.

[104]     *See* Pl. 56.1 ¶¶ 9-11.  *See also* 12/28/07 Day of Ghadir Memorandum, Ex. 1 to Rettig Decl.; 1/3/08 Day of Mubahila Memorandum, Ex. 1 to Rettig Decl.

[105]     1/17/08 Memorandum, Bates 68, Ex. 6 to Rettig Decl.  *See also* Pl. 56.1 ¶ 26.

their rights."[106]  The Woodbourne Superintendent also stated that "[t]he facility is on board for future events."[107]  At that time, Defendants did not appear to have a policy requiring Shiites to register their sect in order to observe Islamic holidays according to Shiite practice.

Defendants do not dispute that Williams's sincerely held religious beliefs were substantially burdened by their conduct, but argue that the denials were reasonably related to legitimate penological interests.[108]  Registration of a religious sect serves legitimate penological interests by assisting prison officials in allowing a "congregation" or putting the "institution on notice that certain religious accommodations will likely be sought."[109]  However, Defendants have failed to provide evidence that *any policy* existed during this time period.  Absent the existence of a policy requiring Shiites to register their sect, Defendants cannot very well make the argument that there were legitimate penological purposes for the denials when Defendants had previously permitted inmates to observe Islamic holidays according to Shiite practice and to attend Shiite study group sessions

---

[106]    Pl. 56.1 ¶ 19.

[107]    2/12/08 Superintendent's Response, WB 14125-08, Bates 22, Ex. 13 to Rettig Decl. *See also* Pl. 56.1 ¶ 27.

[108]    *See* Def. Mem. at 17.

[109]    *Jackson-Bey*, 115 F.3d at 1096-97.

without requiring any such registration.[110]  In fact, King had agreed to make Shiite-specific accommodations without requiring any registration when he assured TerBush that "religious meals [would be] provided in the future" in response to Williams's grievance that he was not permitted to fast for the full ten days of Muharram.[111]

Furthermore, even if Woodbourne had a policy with legitimate penological purposes, Defendants must also show that the policy was *actually* motivated by those purposes.[112]  Given Defendants' accommodation of Shiite-specific worship without a policy prior to 2008, Latif's decision to celebrate only the last two days of Muharram, and King's promise to provide accommodations in the future, a question of material fact remains as to whether the deprivations actually served, or were intended to serve, the legitimate penological interests asserted.  Summary judgment is thus denied on the pre-April 2009 claims.

Defendants argue that any claims based on events that took place prior

---

[110]    *See e.g.,* 12/28/07 Day of Ghadir Memorandum, Ex. 1 to Rettig Decl.; 1/3/08 Day of Mubahila Memorandum, Ex. 1 to Rettig Decl.; 3/08 Masjid At-Tawheed Call Out Form Re: Shi'a Muslim Classes, Ex. 2 to Rettig Decl.; 11/08 Masjid At-Tawheed Call Out Form Re: Shi'a Muslim Classes, Ex. 2 to Rettig Decl.; 12/16/08 Day of Ghadir Memorandum, Ex. 3 to Rettig Decl.; 12/23/08 Day of Mubahila Memorandum, Ex. 3 to Rettig Decl.

[111]    1/17/08 Memorandum, Bates 68, Ex. 6 to Rettig Decl.

[112]    *See Salahuddin*, 467 F.3d at 275.

28

to March 2008 are time-barred.  This argument also fails because the pre-2008

deprivations were part of a pattern or practice of discrimination whose last act, the

denial of Williams's participation in Muharram in 2010, took place within the

three-year statute of limitations period.

### 2.   Post-April 2009 Policy – Free Exercise Claims Against King and Latif

In order "'to establish standing to challenge an allegedly

unconstitutional policy, a plaintiff must submit to the challenged policy.'"[113]  This

requirement "may be excused only where a plaintiff makes a substantial showing

that application for the benefit . . . would have been futile."[114]  In *Jackson-Bey v.*

*Hanslmaier*, the court ruled that the plaintiff lacked standing to bring the action

because his injury stemmed from his own refusal to comply with the prison's

registration policy.[115]

Williams admits that in April 2009, Defendants instituted a policy

requiring Shiite registration in order to participate in Shiite-specific worship.

Williams declined to comply with the policy during this time period, and there is

---

[113]    *United States v. DeCastro*, 682 F.3d 160, 164 (2d Cir. 2012) (quoting *Jackson-Bey*, 115 F.3d at 1096).

[114]    *Jackson-Bey*, 115 F.3d at 1096.

[115]    *See id.* at 1098.

no evidence in the record to suggest that compliance would have been futile. Because Williams failed to register his sect after being informed of the policy in April 2009, and he has not made a substantial showing that registration would have been futile, Williams lacks standing to challenge the policy. Accordingly, summary judgment is granted as to Defendants King and Latif on the free exercise claims between April 1, 2009 and December 30, 2009.

### 3. Post December 30, 2009 Registration – Free Exercise Claim Against King

The parties do not dispute that as of 2010, Woodbourne records identified Williams as a Shiite Muslim. However, Williams claims that he was excluded from the Muharram fast in December 2010 despite having registered. The record reveals conflicting evidence on this point. King claims that Williams's name was on the general list for the 2010 Muharram fast, indicating that he would have been allowed to participate.[116] Williams points out that his name was not on the list identifying Shiite Muslims who sought to observe the services in a Shiite-specific manner,[117] and claims that he was denied the right to attend.[118] Thus, there is a genuine issue of fact regarding whether Williams's free exercise rights were in

---

[116]   *See* Muharram 2010 Call Out Form, Ex. 11 to Rettig Decl.

[117]   *See* 12/7/10 Muharram 2010 Memorandum, Ex. 11 to Rettig. Decl.

[118]   *See* Pl. 56.1 ¶ 46.

fact substantially burdened in 2010.    If Williams was denied the right to

participate in Muharram despite having complied with the registration policy,

Defendants likely cannot establish a legitimate penological justification for the

deprivation.

### B.    Equal Protection Claim

The Defendants argue that Williams fails to state a cognizable Equal

Protection claim as he is unable to show that a similarly situated class was treated

differently.[119]  Williams responds that Shiites were the only religious group

required to register their sect as opposed to their "faith group" in order to

participate in religious activities.[120]  Williams alleges that he was informed by

Reverend Santiago, Woodbourne's senior chaplain, that the religion registrar listed

only Islam, not Sunni or Shiite, and thus Sunnis and ostensibly also Shiites could

participate in religious activities without having to register their sect.  Defendants

have not provided any evidence to the contrary.  Accordingly, there is a genuine

issue of material fact as to whether Shiites are similarly situated to other religious

sects, yet treated differently by being required to register, in violation of the Equal

Protection Clause.  Additionally, as discussed above, there are disputed issues of

---

[119]    *See* Def. Mem. at 19.

[120]    *See* Pl. Mem. at 20.

fact regarding whether the selective registration policy requiring Shiites Muslims to register their sect in order to participate in Islamic holidays and religious practices was reasonably related to legitimate penological interests rather than motivated by discriminatory purposes.  The Defendants' motion for summary judgment on the Equal Protection claim is therefore denied.

### C.    Retaliation

#### 1.    Defendant King

Williams argues that Defendants King, Katz, and Huggler searched his cell and planted contraband – resulting in a disciplinary hearing and a thirty-day confinement in the SHU – in retaliation for exercising his First Amendment rights.[121]  The Defendants concede that filing a grievance is a protected activity, but argue that a cell search is not adverse conduct within the context of a First Amendment retaliation claim.[122]  They argue further that Williams has failed to show any causal connection between his grievances and the cell search.[123]  Finally, the Defendants contend that Williams fails to allege sufficient personal

---

[121]    *See id.* at 21.

[122]    *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (holding that a prisoner's right to file grievances is constitutionally protected under the First and Fourteenth Amendments).

[123]    *See* Def. Mem. at 12.

involvement on the part of King.[124]

   While the Second Circuit has not decided whether a cell search can

constitute an adverse action, many district courts within the circuit have held that it

cannot.[125]  However, the alleged planting of evidence and the allegedly

disproportionate administrative actions that followed are serious enough to

constitute adverse actions.[126]

   Williams has not offered sufficient evidence that King was personally

involved in the cell search.  His claim that King ordered the search is not based on

personal knowledge and appears to be mere speculation.  King insists that her

duties do not involve ordering or overseeing cell searches,[127] and the record reveals

---

[124]   *See id.*

[125]   *See, e.g., Mateo v. Bristow*, No. 12 Civ. 5052, 2013 WL 3863865, at
*5 (S.D.N.Y. Jul. 16, 2013); *Mateo v. Alexander*, No. 10 Civ. 8427, 2012 WL
864805, at *4 (S.D.N.Y. Mar. 12, 2012) (citing *Battice v. Phillip*, No. 04 Civ. 669,
2006 WL 2190565, at *7 (E.D.N.Y. Aug. 2, 2006)); *Carl v. Griffin*, No. 08 Civ.
4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011); *Salahuddin v. Mead*, No.
95 Civ. 85881, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002).

[126]   *See Holmes v. Grant*, No. 03 Civ. 3426, 2006 WL 851753, at *15
(S.D.N.Y. Mar. 31, 2006) (defendants' actions in filing false inmate misbehavior
reports against plaintiff, keeping him in keeplock, transferring him to the SHU, and
stealing his legal papers constituted adverse actions).

[127]   *See* King Decl. ¶¶ 17-18.

that Katz ordered Huggler to perform the search.[128]

Williams offers the statement by C.O. Carpenter allegedly made subsequent to the cell search to suggest King's personal involvement.[129]  However, any statement by Carpenter is inadmissible hearsay that cannot be considered.[130] While Latif's statement about the possibility of a misbehavior report is admissible as a statement of a party-opponent,[131] his stray comment standing alone is insufficient to raise a triable issue of fact regarding King's personal involvement and in any event relates to a possible misbehavior report rather than a cell search. Because there is insufficient evidence that King ordered Katz to conduct the cell search or was in any way personally involved in the search, summary judgment is granted to King on the retaliation claim.[132]

### 2.    Defendants Katz and Huggler

---

[128]    *See* Letter from Huggler to Sgt. J. Bowers, Re: Grievance WB 14857-10, Bates 170, Ex. 16 to Rettig Decl.

[129]    *See* Pl. 56.1 ¶ 61.

[130]    The Federal Rules of Evidence define hearsay as declarant's out-of-court statement 'offer[ed] in evidence to prove the truth of the matter asserted in the statement.' Fed.R.Evid. 801(c).  Hearsay is admissible only if it falls within an enumerated exception. *See id.* 802.

[131]    *See id.* 801(d)(2).

[132]    *See Graham*, 2008 WL 1849167, at *8 (granting summary judgment to defendant noting that plaintiff's conclusory allegations were not sufficient evidence of personal involvement).

Williams failed to exhaust his administrative remedies with respect to

Defendants Katz and Huggler as required by the PLRA because he never appealed

the 2010 cell search grievance,[133] nor did he file other grievances against Huggler

addressing the incidents that took place after the complaint in the instant action

was filed.  In order to determine whether a prisoner has exhausted his

administrative remedies, a court must look at three factors: (1) whether the

administrative remedies are available to the inmate; (2)  whether the defendant is

estopped from asserting an exhaustion defense; and (3) whether special

circumstances exist that would excuse the inmate from fulfilling his exhaustion

requirements.[134]  All three factors favor summary judgment for Katz and Huggler.

*First*, administrative remedies were available to Williams.  "The test

for deciding whether the ordinary grievance procedures were available must be an

objective one: [ ]would 'a similarly situated individual of ordinary firmness' have

deemed them available."[135]  Williams was aware of the available administrative

---

[133]     *See* 6/22/10 Williams Grievance, WB 14857-10, Bates 162, Ex. 16 to
Rettig Decl.

[134]     *See Mena v. City of New York*, No. 12 Civ. 28, 2014 WL 2968513, at
*6 (S.D.N.Y. Jun. 27, 2014) (citing *Hemphill v. New York*, 380 F. 3d 680, 686 (2d
Cir. 2004))

[135]     *Hemphill*, 380 F.3d at 688 (quoting *Davis v. Goord*, 320 F.3d 346,
353) (2d Cir. 2003)).

remedies as he had previously filed and appealed other grievances. *Second*, neither

Katz nor Huggler is estopped from raising an exhaustion defense because they

raised exhaustion as an affirmative defense at the first possible opportunity –

namely in their answer to the SAC.[136] *Finally*, Williams does not allege any

special circumstances that would excuse the exhaustion requirement. Accordingly,

summary judgment is granted with respect to each of Williams's retaliation claims

against Katz and Huggler.[137]

### D.    Qualified Immunity

Finally, the Defendants argue that they are each entitled to qualified

immunity on the Free Exercise and Equal Protection claims.[138] The claims based

on events occurring between April 2009 and December 2009 have already been

dismissed. The question is whether King's and Latif's actions before April 2009,

---

[136]    Williams's reliance on *Handberry v. Thompson* is misplaced. There, the Second Circuit affirmed the district court's conclusion that certain defendants waived the exhaustion defense because they had previously explicitly denied that the defense applied. *See* 436 F.3d 52 (2d Cir. 2006).

[137]    Because of the failure to exhaust his administrative remedies pursuant to the PLRA, summary judgment is granted with respect to Williams's First Amendment retaliation claims against (1) Katz and Huggler for the cell search in 2010, (2) against Huggler for allegedly deleting his legal work, opening his legal mail, and causing Williams's tardiness to a Court telephone conference, and finally (3) against Katz for ordering an alleged retaliatory cell search and conducting an alleged biased disciplinary hearing in 2013.

[138]    *See* Def. Mem. at 21.

and King's actions after December 2009, violated clearly established law.
Defendants argue that there is no clearly established right to avoid religious
registration. In fact, the Second Circuit has held that there are legitimate
penological reasons for requiring inmates to register their religion or sect in order
to participate in programs and activities offered by the prison.[139] However, it is
clear that prison officials may not substantially burden an inmate's religious
practice, or selectively discriminate against an inmate based on religion, without
legitimate penological justification.[140] It is also well-established that depriving an
inmate of the right to fast or attend religious services constitutes a substantial
deprivation.[141] Finally, crediting Williams's assertions that no other sect was
required to register, any reasonable officer would have known that restricting
Williams's Shiite practices for failing to register as a Shiite constituted selective
treatment based on religious affiliation.[142]

---

[139]   *See Jackson-Bey*, 155 F.3d at 1096.

[140]   *See Holland*, 2014 WL 3360615, at *6; *LeClair*, 627 F.2d at 609-10.

[141]   *See Ford*, 352 F.3d at 597; *Salahuddin*, 993 F.2d at 308.

[142]   In two recent cases, the Supreme Court has departed from the
"reasonable officer" formulation of the qualified immunity standard. It has held,
instead, that the immunity "protects all but [] plainly incompetent" officials from
liability. *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2085 (2011). *See also Stanton v.
Sims*, 134 S.Ct. 3, 5 (2013) (reciting the "plainly incompetent" language). But
even under this heightened standard, King's actions remain susceptible to liability.
In light of the Second Circuit's crystal-clear holdings on the matter (*see Ford*, 352

Defendants have not established the existence of a policy requiring sect registration before April 2009. In fact, after Williams was denied the right to celebrate Muharram according to Shiite custom in 2008, the IGRC found the incident to be a violation of the Protocol and recommended "formal disciplining and/or reprimand" of Latif.[143] Moreover, King acknowledged that her management of Muharram had been a mistake and assured TerBush, the grievance supervisor, that the facility would accommodate future events.[144] Even if a Shiite registration policy *would have* had rational justifications, King and Latif cannot credibly claim that their actions were motivated by those justifications if no such policy existed. Furthermore, Latif's comment that fasting during the ten days of Muharram was not of any religious importance in the Islamic faith supports Williams's claim of anti-Shiite animus.[145] Therefore, qualified immunity is denied to both King and Latif on the pre-April 2009 claims.

---

F.3d at 597), no competent prison official would believe it lawful to deprive prisoners of religiously-motivated dietary requests. And the idea that a prison may require adherents of *specific* sects to register their affiliation, without instituting a generally-applicable policy of such registration, appears to be discriminatory on its face. Only an incompetent official, unaware—or contemptuous—of the Fourteenth Amendment's protections, could sanction such a policy.

[143]   Case History & Record, WB-14125-08, Bates 3-4, Ex. 13 to Rettig Decl.

[144]   *See* 1/17/08 Memorandum, Bates 68, Ex. 6 to Rettig Decl.

[145]   *See* Williams Decl. ¶ 21.

Similarly, King is not entitled to qualified immunity with respect to Williams's claim that he was excluded from the full Muharram fast in 2010 even after registering as a Shiite.  Even if the Shiite registration policy had legitimate penological purposes, no reasonable officer could believe that restricting Williams's religious practices in 2010 served those interests if Williams was in complete compliance with the policy at the time.  In sum, Williams has raised triable issues of fact as to whether the Defendants' actions were based on the articulated penological interests rather than an impermissible discriminatory purpose.  Therefore, Defendants are not entitled to qualified immunity on either of the remaining Free Exercise or Equal Protection claims.

## VI.   CONCLUSION

For the following reasons, the Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The Clerk of the Court is directed to close this motion (Doc. No. 71).  A conference is scheduled for August 19, 2014 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      August 11, 2014
            New York, New York

39

## - Appearances -

**For Plaintiff:**

Rebecca Lauren Rettig, Esq.
Jacqueline Dorothy Harrington, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1774


**For Defendants:**

Inna Ringh
Michael J. Keane
Jeb Harben
Assistant Attorneys General
Office of the New York State Attorney General
120 Broadway
New York, NY 10271
(212) 416-8612